

JUN 1 6 2006

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SUN PACIFIC FARMING COOPERATIVE, INC., | ) | No. CV-F-01-6102 REC/DLB |
| | ) | |
| | ) | FINDINGS OF FACT AND |
| | ) | CONCLUSIONS OF LAW |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SUN WORLD INTERNATIONAL, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| SUN WORLD INTERNATIONAL, INC., | ) | |
| | ) | |
| Counter-Claimant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SUN PACIFIC FARMING COOPERATIVE, INC., SUN PACIFIC FARMING CO, BERNIE H. EVANS III and RICHARD PETERS, | ) | |
| | ) | |
| Counter-Defendants. | ) | |
| _____ | ) | |

1

1   Based on the undisputed facts set forth in the Pretrial
2   Order, the evidence and testimony presented at trial on January
3   27, 2004 and the written and oral arguments of the parties, the
4   court finds for defendant/counter-claimant Sun World
5   International, Inc. and against plaintiff Sun Pacific Farming
6   Cooperative, Inc and counter-defendants Sun Pacific Farming
7   Cooperative, Inc., Sun Pacific Farming Co., Bernie H. Evans III
8   and Richard Peters.

9   **I.   UNDISPUTED FACTS**.

10   The following undisputed facts are set forth in the Pretrial
11   Order filed on October 30, 2003 and are adopted as findings of
12   fact:

13           1.   In 1972, Superior Farming Company (hereinafter
14   Superior Farming) completed a transaction with John Garabedian,
15   Bertha Garabedian, Richard Peters, Barbara Peters, the Panoche
16   Land Company and the Peters & Garabedian partnership concerning
17   the sale of certain real and personal property and intellectual
18   property rights.   The precise terms and effect of the 1972
19   transaction are in dispute in this action.

20           2.   In 1972, Superior Farming was a wholly-
21   owned subsidiary of Superior Oil Company.   Prior to the 1972
22   transaction at issue in this action, Superior Farming had
23   approximately 300 year round employees.   Superior Oil Company had
24   approximately 5,000 employees and was worth approximately six
25   billion dollars in 1972.

26           3.   Sun World International, Inc. (hereinafter Sun

2

World) is the successor-in-interest to the Superior Farming Company. Sun World owns the legal rights to the Sugarone grape variety that were acquired by Superior Farming Company in 1972.

4. Sun World sells Sugarone grapes in the United States under its trademark "Superior Seedless®."

5. The Sugarone is a seedless grapevine variety.

6. Because it is a seedless variety, one cannot reproduce or propagate the Sugarone from the grapes. Sugarone can be propagated only by using cuttings or propagating material from an existing vine.

7. John Garabedian (hereinafter Garabedian) submitted an application for a United States plant patent for what was later named the Sugarone on or about April 29, 1970. In his patent application, Garabedian stated under oath that he invented this variety.

8. The United States Patent and Trademark Office issued a United States Plant Patent, No. 3,106 to Garabedian on April 11, 1972. The patent issued to Garabedian as the sole inventor, and recites Garabedian's representation that the Sugarone grapevine "was originated by me, on a ranch of which I am owner ... as a cross between the Cardinal and an unnamed sport (unpatented) previously found by me in a vineyard (of which I am also the owner) located near Fresno, Fresno County, California. The seedling vine, which resulted from the above described cross, was maintained by me under careful control and continuing observation."

1     9.   Richard Peters (hereinafter Peters) reviewed the
2  Sugarone plant patent application and patent, and never made any
3  efforts to be added to the patent application or patent as a
4  named inventor.

5     10.  At the time Garabedian submitted an application
6  for a patent for the Sugarone, he was a partner in the farming
7  partnership Peters & Garabedian.

8     11.  The Sugarone was the subject of a pending patent
9  application at the time of the 1972 transaction.

10    12.  In 1970, the parties commenced negotiations over
11 the sale of Garabedian's farming business.  At that time,
12 Garabedian told Superior Farming that "our products ... are
13 exclusively patented, and grown and shipped only by ourselves."

14    13.  Garabedian had an initial meeting with Superior
15 Farming's president, Fred Andrew, and its vice-president, Milo
16 Hall.  In that initial meeting, Garabedian told Andrew and Hall
17 that he had produced many patented varieties over the years, and
18 that he sold the fruit but not the varieties.  "He did not want
19 people competing with him by shipping his fruit at a time when it
20 would not be ready because the trade would not accept it as
21 well."

22    14.  Milo Hall and Fred Andrew conducted the
23 negotiations of the 1972 acquisition on behalf of Superior
24 Farming; Hall and Andrew negotiated the terms of the 1972
25 transaction with Garabedian.

26    15.  Garabedian conducted the negotiations with Peters'

1   authority and permission, and Peters was relying on Garabedian
2   "one hundred percent" to drive the acquisition."

3           16.   Peters owned some land that was sold to Superior
4   Farming in the acquisition.

5           17.   Superior Farming had no discussions or
6   negotiations with Peters concerning the terms of the 1972
7   transaction.   Garabedian kept Peters informed of the negotiations
8   concerning the portion of the transaction which involved Peters'
9   interest.

10          18.   In September 1971, Superior Farming and Garabedian
11  signed a Letter of Intent.   The Letter of Intent specified that
12  Garabedian "would turn over to Superior Farming Company [his]
13  entire business of raising and marketing patented varieties of
14  fruits and grapes" and that subject to final acquisition
15  documents being signed, Superior Farming "agrees to acquire and
16  take over from you, and you agree to transfer and turn over to
17  Superior, your entire business of raising and marketing patented
18  fruits and grapes."   Superior Farming agreed to pay a share of
19  the proceeds it received from the sale of patented fruits and
20  grapes during the life of each transferred patent.   In addition,
21  the Letter of Intent contained various provisions regarding the
22  handling and disposition of Garabedian's patented varieties.

23          19.   Milo Hall was never informed of any "exclusive"
24  varieties of Garabedian's that were not the subject of a patent
25  or a patent application.

26          20.   Garabedian told Superior Farming during the

5

1  negotiations that "all of us in our organization are firmly
2  convinced that our new variety of grapes [the Sugarone variety]
3  will shortly dominate the market to such a degree that it will
4  virtually eliminate competition."

5       21.   The December 9, 1971 memorandum by Eugene Teal
6  notes, in the first bullet point under the heading "1.
7  MARKETING," that: "Some valuable varieties are not yet patented
8  and their value would be lessened if they did not receive
9  patents."

10      22.   During the negotiations, Garabedian stated that he
11  was "quite concerned about some provision [being made] for
12  Richard Peters," and wanted to ensure that there be "some
13  incentive provision out of this deal to hold [him] and retain
14  [his] interest in the Garabedian varieties and operation."

15      23.   In September 1971, Garabedian offered two
16  suggestions to Superior Farming to accommodate his concern for
17  Peters' interests: (1) that Peters be allowed to retain his
18  present position and salary "but, in addition, to provide [him]
19  with some consulting fee"; or (2) that Peters be allowed "to grow
20  some of [Garabedian's patented] varieties on [his] own."

21      24.   Superior Farming considered and rejected
22  Garabedian's suggestion that Peters be allowed to grow any of the
23  patented varieties.

24      25.   Garabedian reported that rejection to Peters and
25  thereafter Peters considered the issue to be "dead."

26      26.   Prior to January 1972, the Sugarone variety was

6

1 | planted on four properties:  three properties in Oasis,
2 | California, and one in Mecca, California.

3 | 27.  One of the two pieces of real estate sold by
4 | Peters in the 1972 acquisition was the Mecca ranch, located in
5 | the Coachella Valley, Riverside County.  The Mecca ranch was
6 | owned by Peters, Garabedian and their wives as joint tenants.

7 | 28.  In January 1972, Peters visited the Mecca ranch
8 | (property that was to be transferred to Superior Farming in the
9 | acquisition), took cuttings from Sugarone vines growing on the
10 | property, and transferred the cuttings to the property of a
11 | friend of his - property not involved in the acquisition.

12 | 29.  In January 1972, the patent on the Sugarone
13 | variety was pending but had not yet issued.  (As found above,
14 | Garabedian submitted his application for a United States plant
15 | patent for the Sugarone on or about April 29, 1970).

16 | 30.  Peters testified that he could not remember
17 | telling Garabedian (the Sugarone's named inventor) that he
18 | transferred Sugarone cuttings to property not involved in the
19 | acquisition.

20 | 31.  In January 1972, Superior Farming's Board of
21 | Directors approved the acquisition.

22 | 32.  Pursuant to the 1972 acquisition, Superior Farming
23 | collectively paid John Garabedian, Bertha Garabedian, Richard
24 | Peters, Barbara Peters, the Panoche Land Company and the Peters &
25 | Garabedian partnership more than $7 million.

26 | 33.  The parties executed the acquisition through a

7

1  series of documents constituting an integrated contract -
2  including principally, the Agreement, the Bill of Sale, and the
3  Assignment - executed in March and April 1972.

4           34.   Peters did not draft or sign the Agreement, and
5  did not negotiate or discuss it with Superior Farming.

6           35.   Peters signed the Bill of Sale because he had an
7  ownership interest in two pieces of real estate - including the
8  Mecca Ranch - that were being sold to Superior Farming.

9           36.   Peters did not draft or sign the Assignment, and
10 did not negotiate or discuss it with Superior Farming.

11          37.   Pursuant to the Agreement, John Garabedian, Bertha
12 Garabedian, Richard Peters, Barbara Peters, the Panoche Land
13 Company and the Peters & Garabedian partnership sold certain
14 parcels of real estate, personal property and equipment,
15 trademarks, patents and patent applications to Superior Farming.

16          38.   The Agreement effected a transfer of "certain
17 parcels of real property in Fresno, Madera, Riverside and
18 Imperial Counties, California, certain personal property and
19 equipment and certain patents, patent applications and trademark
20 rights as follows:" which are listed in numbered paragraphs 1-3
21 of the first page of the 1972 Agreement.  These paragraphs recite
22 the sale of real property (Exhibits A, B, C and D to Appendix 1
23 of the 1972 Agreement), personal property (Exhibit E to Appendix
24 1 of the 1972 Agreement), patents and patent applications
25 (Exhibit F to Appendix 1 of the 1972 Agreement) and two
26 trademarks for $7,711,750.00.

8

1          39.   Exhibits A-D of Appendix 1 of the 1972 Agreement
2 transferred real estate.   Exhibit E of Appendix 1 of the 1972
3 Agreement is a 35 page list of the over 500 transferred items of
4 personal property.   Exhibit F of Appendix 1 to the 1972 Agreement
5 is a list of the transferred patents and patent applications.

6          40.   The Bill of Sale, dated April 8, 1972, states:
7 "Sellers have bargained, sold and delivered and by these presents
8 do bargain, sell and deliver unto Buyer all of their right, title
9 and interest in and to that certain personal property, equipment
10 and improvements described and identified in Exhibits E, F, and G
11 attached hereto and hereby made a part hereof, together will all
12 personal property, fixtures and improvements including trees,
13 vines and growing fruit, affixed to or situated on the lands
14 described in said Exhibits A, B, C, and D whether or not the same
15 are specifically enumerated in said Exhibits E, F, or G.   This
16 sale is made without any warranty or representation as to the
17 condition of the property herein sold and delivered, however,
18 Sellers warrant that they are the owners of said property and the
19 same is free of all liens and encumbrances and that they have the
20 right to sell and deliver the same to Buyer."

21          41.   In the Assignment, Garabedian represented that he
22 was "the owner of the entire right, title, and interest in the
23 patents and patent applications identified on the attached
24 Schedules A and B and make this sale and assignment free and
25 clear of all licenses, encumbrances, liens and security interests
26 whatsoever, and that I have not executed and will not execute any

                                    9

1   instruments or enter into any agreements in conflict herewith."

2           42.  The Sugarone patent application is listed on

3   Schedule B to the Assignment.

4           43.  The Assignment conveyed to Superior Farming

5   various enumerated rights, including principally (a) "the entire

6   right, title and interest in and to all plant patents and plant

7   patent applications owned or controlled by me, including the

8   plant patents and plant patent applications identified on the

9   attached Schedules A and B"; (b) "the entire right, title and

10   interest in and to any and all United States and foreign patents

11   and legal protection now or hereafter obtained for all plants

12   therein set forth, shown or described including reissues,

13   extensions and additions"; (c) "the entire right, title and

14   interest in and to any and all applications for patents on such

15   plants in the United States and foreign countries, including any

16   division, continuation, continuation-in-part, substitute or

17   addition"; (d) "the right to make application for and obtain

18   patents and legal protection on such plants in the United States

19   and foreign countries, specifically including the right to file

20   foreign applications for patent under the provisions of any

21   convention or treaty and claim priority based on any application

22   for patent in the United States"; (e) "the right to bring suit

23   for past infringement of any and all such patents"; (f) "and the

24   entire right, title and interest in the recovery for such past

25   infringement."

26           44.  The Assignment also included Garabedian's

10

1   agreement to "hereby covenant and bind myself, my executors,

2   administrators and personal representatives, without further

3   consideration, but at no undue expense without reimbursement, to

4   communicate to SUPERIOR, its successors, assigns and nominees,

5   whenever requested, all information in my or their possession or

6   control respecting such plants, patents and applications; to

7   testify and join as a litigant in any legal proceeding, to sign

8   and deliver all lawful papers, execute all divisional,

9   continuing, reissue and foreign application and make all rightful

10  oaths and statements relating to such plants as requested by

11  SUPERIOR, its successors and assigns, to apply for, obtain,

12  maintain and enforce protection for such plants in all countries

13  and to effectuate the purposes of this instrument."

14          45.   Garabedian and Superior Farming also entered into

15  a Royalty Agreement.  Pursuant to this agreement, Garabedian was

16  to be paid a royalty on revenues derived for ten years from

17  Superior Farming's sale of the fruit from the patented varieties

18  sold to Superior Farming pursuant to the 1972 Agreement,

19  including the Sugarone.

20          46.   After the acquisition was completed, Superior

21  Farming and Peters entered into a "Farm Management Agreement," by

22  which Peters was paid $15,000 per year plus a fee based on each

23  unit of fruits or grapes produced and sold from the land subject

24  to the Farm Management Agreement.

25          47.   On July 6, 1972, Superior Farming sent a

26  memorandum to all personnel, stating:  "No patented varieties of

11

fruit or grapes are to be planted on any property other than that land which belongs to Superior Farming Company and is so designated to be planted to that variety.  This includes home plantings by our personnel, on or off Superior Farming Company property.  You may be asked from time to time if someone may have 'just one cutting' for home plantings.  This is in direct contradiction to our rules.  We do not sell any breeding stock from these varieties, and we can get into a great deal of trouble should any get away from our ranches."

48.   On October 20, 1980, eight years after the execution of the 1972 acquisition, Garabedian and Superior Farming entered into an agreement which settled various lawsuits which were pending between these two parties.

49.   The patent on the Sugarone variety expired in 1989.

50.   Peters transferred the Sugarone vines derived from the cuttings from the Mecca ranch to Sun Pacific Farming Cooperative, Inc. (hereinafter Sun Pacific) in 1993.

51.   In August 2001, Sun Pacific agreed to indemnify Peters against litigation based on "the possession, propagation, or sale of Superior Seedless/Sugarone grapes or vines."

52.   Sun Pacific has sold 672 boxes of Superior Seedless grapes at approximately twelve dollars a box.

## II.   FINDINGS OF FACT.

In addition to the facts set forth above, the Court finds the following facts based on evidence and testimony presented at

trial:

53.   Garabedian maintained control over his varieties and therefore was in a position to convey exclusive control over the Sugarone variety to Superior Farming.

54.   Garabedian sold the fruit from his varieties. Garabedian did not sell the plants or cuttings from which further plants could be grown because Garabedian did not want other growers competing with him with respect to those varieties.

55.   Peters confirmed that maintaining control over Garabedian's exclusive varieties was an important aspect of their business before it was sold to Superior Farming.

56.   Garabedian and Superior Farming contemplated and agreed while negotiating the acquisition that the acquisition would transfer to Superior Farming exclusive control over Garabedian's varieties, including the Sugarone.

57.   The Sugarone grapevine was one of Garabedian's exclusive varieties and the negotiating parties - Garabedian and Superior Farming - regarding the Sugarone as a pivotal component of the acquisition.

58.   Throughout the negotiations Superior Farming understood that Garabedian was negotiating on behalf of himself and the other sellers who were involved in the acquisition, i.e., Bertha Garabedian, Richard and Barbara Peters, the Panoche Land Company, and the Peters & Garabedian partnership.

59.   Garabedian did in fact negotiate the acquisition on behalf of himself and the other sellers, including Peters.

1        60.   Peters asked, through Garabedian, for permission
2   to grow some of Garabedian's proprietary varieties "following the
3   transaction."   Peters acknowledged that Superior Farming
4   explicitly rejected his request, and that thereafter Peters
5   understood this issue was "dead."

6        61.   The contracting parties understood and intended
7   that this explicit rejection by Superior Farming prohibited
8   Peters from keeping any Sugarone vines following the acquisition.

9        62.   The contracting parties did not authorize Peters
10  during the negotiations to take and keep Sugarone vine cuttings
11  from that land that he and his partners sold to Superior Farming.

12       63.   Superior Farming's express intention was to
13  acquire, and the sellers' intention as communicated to Superior
14  Farming was to sell, all rights in the Sugarone variety and all
15  existing Sugarone vines.

16       64.   On August 4, 1971, Superior Farming sent
17  Garabedian a letter containing "a very general accumulation of
18  [his] thoughts."   The letter states that "Superior Farming
19  Company and Garabedian both agree that none of Garabedian's
20  patented varieties will be sold, given away, or, in any other way
21  whatsoever, be permitted to be propagated by any other grower."
22  The letter also addresses the fact that some of Garabedian's
23  property that was planted with patented varieties was better
24  suited for real estate development and thus would not be sold to
25  Superior Farming.   Consequently, "Garabedian lands that are sold
26  for real estate purposes will provide that all trees and vines

14

1   remain in Garabedian's custody until the same amount of acreage
2   and variety is in production on Superior lands, then, all trees
3   and vines on the lands will be pulled out and destroyed."   Both
4   of these provisions reflect the parties' intent and understanding
5   that the acquisition would transfer control over Garabedian's
6   exclusive varieties to Superior Farming.

7            65.   In September 1971, Superior Farming and
8   Garabedian signed a Letter of Intent.   The contracting parties
9   understood the Letter of Intent to set up a transfer of control
10  over Garabedian's exclusive varieties - including the Sugarone
11  variety.

12           66.   Peters testified that this understanding, that
13  Garabedian was going to transfer and turn over to Superior
14  Farming his entire business of raising and marketing fruits and
15  grapes, was consistent with what Peters understood the
16  transaction's purpose to be.

17           67.   The contemporaneous negotiation documents evidence
18  the parties' intent to transfer to Superior Farming the exclusive
19  rights to all Sugarone assets, including all existing Sugarone
20  vines.

21           68.   At no point during the acquisition negotiations
22  did Peters personally discuss with any Superior Farming
23  representative the notion that he be allowed to keep or grow any
24  of Garabedian's exclusive varieties.

25           69.   The contracting parties agreed during the
26  acquisition negotiations that all exclusive varieties that were

                                15

1  planted on land not acquired by Superior Farming would be ripped
2  up and destroyed after the acquisition closed.  The parties'
3  agreement to destroy all known plantings of the patented
4  varieties on all land not acquired by Superior Farming evidences
5  that control over Garabedian's exclusive varieties was central to
6  the acquisition.

7           70.   Prior to 1972 and throughout the two year period
8  that Garabedian and Superior Farming were negotiating the
9  acquisition, the Sugarone variety was planted on four properties:
10  three properties in Oasis, California, and one in Mecca,
11  California.

12           71.   During the negotiations, Garabedian represented to
13  Superior Farming that those four properties were all of the land
14  on which the Sugarone variety was growing.

15           72.   Representatives of Superior Farming, including
16  Milo Hall, inspected the Oasis and Mecca properties, along will
17  all other properties on which Garabedian's exclusive varieties
18  were planted.

19           73.   Peters secretly transplanted vines from the Mecca
20  ranch after Superior Farming inspected the Mecca ranch and
21  shortly before Peters signed the Bill of Sale.

22           74.   Peters admitted that, but for his secret conduct,
23  the sale of the Mecca ranch and the properties in Oasis,
24  California would have transferred all existing Sugarone vines to
25  Superior Farming.

26           75.   Peters' testimony that he did not move Sugarone

16

1  vines from the Mecca ranch and that he only took cuttings is not
2  credible and is not material because Superior Farming rejected
3  Peters' request via Garabedian to grow the Sugarone variety after
4  the acquisition closed.

5          76.  To obtain control over the Sugarone variety,
6  Superior Farming purchased all of the land on which Garabedian
7  had represented the Sugarone was growing, purchased title to the
8  vines on that land, and obtained an assignment of the
9  intellectual property rights to the Sugarone variety.

10          77.  In pertinent part, the Agreement transferred to
11  Superior Farming all of the land on which Garabedian had
12  represented Sugarone vines were growing, i.e., the Oasis and
13  Mecca properties.

14          78.  By specifically enumerating the real, personal and
15  intellectual property transferred from the sellers to Superior
16  Farming, the parties to the 1972 acquisition intended the
17  Agreement to effectuate a complete transfer of the sellers'
18  proprietary fruit business, not to serve as a limit on the
19  transfer.

20          79.  Garabedian and Peters expressly represented in the
21  Bill of Sale that they had "sold and delivered ... all of their
22  right, title and interest in and to ... all personal property,
23  fixtures and improvements including trees, vines and growing
24  fruit, affixed to or situated on [the Oasis and Mecca properties]
25  whether or not the same are specifically enumerated."

26          80.  By tendering in the Bill of Sale "all personal

17

1 property, fixtures and improvements including trees, vines and
2 growing fruit, affixed to or situated on the lands described,"
3 which included the Mecca Ranch, Peters effected a transfer of all
4 Sugarone vines growing on his property.

5      81.   The Bill of Sale that Peters signed conveyed "all
6 ... right, title and interest" in all of the property related to
7 the Sugarone business, including the "personal property," the
8 "fixtures," and "growing fruit".

9      82.   The Bill of Sale that Peters signed conveyed,
10 among other things, "all ... vines".

11      83.   The acquisition documents evidence an intent to
12 transfer all Sugarone assets.

13      84.   The parties understood and intended that the
14 Agreement, the Bill of Sale and the Assignment transferred all
15 rights, title and interest and exclusive control in the Sugarone
16 variety to Superior Farming.

17      85.   Milo Hall's testimony regarding the contracting
18 parties' understanding and intent with respect to the scope of
19 the acquisition is credible and the contrary testimony of Peters
20 is not credible.

21      86.   Superior Farming would not have executed the
22 acquisition if Superior Farming had known that it was not
23 acquiring exclusive control of the Sugarone variety.

24      87.   The parties to the 1972 acquisition did not intend
25 that Peters be allowed to keep plant cuttings from the Sugarone
26 variety.

1          88.   Peters knew that a term of the 1972 acquisition
2 was the transfer of all existing Sugarone vines to Superior
3 Farming.  His testimony to the contrary is not credible.

4          89.   Peters never told Garabedian or Superior Farming
5 that he had taken Sugarone cuttings from the Mecca Ranch and
6 transplanted them on land not involved in the acquisition.

7          90.   Superior Farming obtained all rights, title and
8 interest in the Sugarone variety pursuant to the 1972
9 acquisition.

10          91.   Pursuant to the 1972 acquisition, Superior Farming
11 paid approximately $7,700,000 to the sellers, principally for the
12 exclusive rights to the Sugarone variety.

13          92.   After the acquisition closed, Superior Farming
14 personnel supervised the destruction of all known plantings of
15 Garabedian's exclusive varieties that were planted on land that
16 Superior Farming had not acquired.

17    93.   After the acquisition, Superior Farming's internal and
18 external documents state that Superior Farming has exclusive
19 control over the exclusive varieties it acquired in the
20 acquisition, documents which are probative of Superior Farming's
21 intent and understanding regarding the 1972 acquisition.

22          94.   The July 6, 1972 memorandum Superior Farming sent
23 to affiliated personnel instructed them that no exclusive
24 varieties could be planted on property other than Superior
25 Farming's because maintaining exclusive control over these
26 varieties was critical to the company.

19

1    95.   Superior Farming's licensee agreements confirm
2  that Superior Farming understood that it had acquired exclusive
3  control over the Sugarone variety, documents which are also
4  probative of Superior Farming's intent and understanding
5  regarding the 1972 acquisition.

6    96.   The 1980 Garabedian Settlement Agreement does not
7  directly concern the Sugarone variety.  However, the Settlement
8  Agreement contains Garabedian's representation that Superior
9  Farming "has exclusive right, title and/or interest" in the
10  Sugarone variety, as well as all other varieties transferred to
11  Superior Farming by virtue of the 1972 acquisition.

12    97.   Garabedian's representation in the 1980 Settlement
13  Agreement is probative of his intent and understanding regarding
14  the 1972 acquisition.

15    98.   The 1980 Settlement Agreement confirms that
16  Superior Farming understood that it had acquired exclusive
17  control over the Sugarone variety and is probative of Superior
18  Farming's intent and understanding regarding the 1972
19  acquisition.

20    99.   Peters infringed the Sugarone patent by
21  propagating Sugarone vines during the patent period.

22    100.   Sun World has incurred compensatory damages of no
23  less than $8,064 based on Sun Pacific's sale of 672 boxes of
24  Sugarone grapes at approximately $12 a box.

25  **III.   CONCLUSIONS OF LAW**

26    Each conclusion of law is independent of all other

20

1 conclusions of law and each provides an independent basis that
2 Sun World is entitled to judgment on claims one, three, and nine.

3        **A.   California Contract Law.**

4        California Civil Code § 1635 et seq. governs the
5 interpretation of contracts in California.  Pursuant to the Civil
6 Code, "[t]he fundamental goal of contractual interpretation is to
7 give effect to the mutual intention of the parties."  In
8 determining the parties' intent, the court must (1) consider all
9 of the provisions of the contract or contracts and give full
10 meaning and effect to each provision, (2) avoid any construction
11 that results in an absurdity, and (3) look to the circumstances
12 surrounding the contract's execution, including the negotiations
13 leading to the contract.

14        As codified in California Code of Civil Procedure § 1856,
15 California's parol evidence rule provides that terms set forth in
16 a writing may not be contradicted by parol evidence.  However,
17 "[t]he terms in a writing ... may be explained or supplemented by
18 evidence of consistent additional terms.'  Even where there is an
19 integrated writing, "extrinsic evidence is admissible ... if it
20 is relevant to prove a meaning to which the language of the
21 instrument is reasonably susceptible."  "Although extrinsic
22 evidence is not admissible to add to, detract from, or vary the
23 terms of a written contract, these terms must first be determined
24 before it can be decided whether or not extrinsic evidence is
25 being offered for a prohibited purpose."  Pacific Gas & Electric
26 Co. v. G.W. Thomas Drayage & Rigging Co., 69 Cal.2d 33, 39

1   (1968).  If the contract "in light of the circumstances" is
2   "fairly susceptible of either one of the two interpretations"
3   sought, the "extrinsic evidence relevant to prove either of such
4   meanings is admissible."  Id. at 40.

5        Under California law, the court must initially consider all
6   parol evidence to determine the parties' intent, and if the
7   proffered parol evidence is consistent with a plausible
8   interpretation of the contract, the court must admit the
9   evidence.  If the parol evidence is not in conflict but permits
10  only one conclusion about the contract's meaning, the contract
11  must be interpreted in accordance with that evidence.  Parson v.
12  Bristol Development Co., 62 Cal.2d 861, 865 (1965).

13       The court concludes that the extrinsic evidence presented at
14  trial is in accord with the most plausible meaning of the
15  acquisition contract and establishes that the contracting parties
16  intended that Peters not retain Sugarone plant material following
17  the acquisition and that the acquisition documents transferred to
18  Superior Farming the exclusive right to the Sugarone variety.
19  For this reason, independent of all other conclusions of law made
20  herein, the court concludes that Sun World is entitled to
21  judgment on claims one, three and nine.

22       In addition, the court was guided by the following
23  principles of California contract law in concluding that Sun
24  World is entitled to judgment on claims one, three and nine.
25  Obvious terms are implied when necessary to effectuate the intent
26  of the parties and, where the parties' negotiation history or

22

1  extrinsic evidence shows that terms were unacceptable, the court

2  may not read the rejected terms into the contract.   A party's

3  unexpressed intentions regarding the effect of a contract are

4  irrelevant to interpretation of the contract.   Because Peters did

5  not participate in the acquisition negotiations or drafting of

6  the acquisition documents, Peters' undisclosed understandings and

7  intentions regarding the contract documents is irrelevant as a

8  matter of law.   Furthermore, pursuant to California Civil Code §

9  1659, "where all the parties who unite in a promise receive some

10  benefit from the consideration, whether past or present, their

11  promise is presumed to be joint and several."

12              **B.   California Agency Law.**

13        As a matter of California law, "[t]he acts of an agent

14  within the scope of his authority binds the principal."   <u>Madden</u>

15  <u>v. Kaiser</u>, 17 Cal.3d 699, 705-706 (1976); <u>see also</u> California

16  Civil Code § 2315 ("an agent has such authority as the principal,

17  actually or ostensibly, confers upon him").   Garabedian's

18  negotiations with Superior Farming as to whether Peters could

19  grow Sugarone vines post-acquisition, Superior Farming's explicit

20  rejection of that request, and Peters' testimony acknowledging

21  that he understood the issue to be "dead", confirms that

22  Garabedian was Peters' agent and that the scope of authority

23  conferred on Garabedian covered Peters' right to retain Sugarone

24  vines following the acquisition.   Peters is bound by the deal

25  that was negotiated and executed with his authority.   The

26  agreement negotiated and executed by the parties transferred

1  exclusive control over the Sugarone variety to Superior Farming.
2  For this reason, independent of all other conclusions of law
3  herein, Sun World is entitled to judgment on claims one, three,
4  and nine.

5         C.  **Fixtures Pass with Land as a Matter of California**
6  **Law**.

7         Under California law, vines planted on real property are
8  "fixtures" that "pass to a purchaser with the fee of that land."
9  Southern Pacific Co. v. Riverside, 32 Cal.App.2d 380, 386 (1939);
10  California Civil Code §§ 658, 660.  Fixtures may be severed from
11  realty, converted to personal property, and not transferred with
12  the sale of land, but this requires a severance agreement.  In
13  the absence of an explicit severance agreement, fixtures pass
14  with the land as a matter of law.  Id.  "It is a general rule
15  that in order for a vendor to reserve the growing crops when the
16  realty is conveyed, there must be a written reservation, and in
17  the absence of such a written reservation, the growing crops pass
18  with the realty."  Sweet v. Watson's Nursery, 33 Cal.App.2d 699,
19  704 (1939).  Sun Pacific's admission that Peters did not discuss
20  the terms of the 1972 acquisition with Superior Farming
21  establishes that there was no severance agreement between Peters
22  and Superior Farming.  The Bill of Sale signed by Peters
23  explicitly includes vines and growing fruit in the list of
24  transferred items.  The 1972 acquisition included all the vines
25  and Peters' removal of some of these vines prior to the
26  acquisition was unauthorized and unlawful.  For this reason,

24

1   independent of all other conclusions of law herein, Sun World is

2   entitled to judgment on claims one, three, and nine.

3         **D.**  **Seller's Duty of Disclosure under California Law.**

4        Pursuant to California law, a seller of real property has a

5   legal duty to disclose undiscoverable facts to a buyer.  "[I]t is

6   now settled in California that where the seller knows of facts

7   materially affecting the value or desirability of the property

8   ... and also knows that such facts are not known to, or within

9   the reach of the diligent attention and observation of the buyer,

10  the seller is under a duty to disclose them to the buyer."

11  Shapiro v. Sutherland, 64 Cal.App.4th 1534, 1544 (1998).  Any

12  fact that "would have a significant and measurable effect on

13  [the] market value" is deemed material and subject to the duty of

14  disclosure.  Assilzadeh v. California Federal Bank, 82

15  Cal.App.4th 399, 410 (2000).  A seller's failure to fulfill the

16  duty of disclosure constitutes actual fraud.  Peters was a seller

17  of the Mecca ranch from which he removed the Sugarone vines and

18  he was also a signatory to the Bill of Sale.  At the time Peters

19  removed the Sugarone vines from the Mecca ranch, Superior Farming

20  had already completed its inspection of that property and, in any

21  event, a diligent inspection would not have revealed the removal

22  of the small number of vines.  The removal of the vines was

23  material because the negotiation documents establish that

24  Superior Farming paid a premium for Garabedian's exclusive

25  varieties.  Peters had a duty to disclose the removal of the

26  Sugarone vines from the Mecca ranch.  Peters testimony that he

did not have any conversations with Superior Farming personnel prior to the acquisition about the Sugarone variety establishes that Peters did not disclose the removal to Superior Farming prior to the acquisition. Peters' violation of this duty to disclose negates any conclusion that his conduct was lawful. The inclusion of an "as is" clause in the Bill of Sale does not cure the failure to disclose. An "as is" clause does not empower a seller to knowingly alter the condition of an item for sale after the buyer's inspection nor does it exonerate a seller from his obligation to disclose undiscoverable material facts to the buyer. Shapiro v. Hu, 188 Cal.App.3d 324, 333-334 (1986). For this reason, independent of all other conclusions of law here, Sun World is entitled to judgment.

## E. Declaratory Judgment.

Declaratory relief pursuant to 28 U.S.C. § 2201 is appropriate where "there is a substantial controversy, between parties having adverse interests, of sufficient immediacy and reality to warrant issuance of a declaratory judgment.

By virtue of the 1972 acquisition, Superior Farming purchased "all ... right, title, and interest in and to" the Sugarone variety. Sun World is the successor-in-interest to Superior Farming. Sun World is entitled to a declaration on claim nine that the present possession of Sugarone vines derived from those cuttings taken by Richard Peters from the Mecca ranch in 1972 by Peters and Sun World is unlawful.

## F. Conversion.

26

1    Under California law, conversion is an intentional exercise
2  of dominion over a chattel which interferes with the right of
3  another to control it.  DeVries v. Brumbeck, 53 Cal.2d 643, 647
4  (1960).  The elements of a claim of conversion are: (1) the
5  claimant's ownership or right to possession of the property; (2)
6  the opposing party's conversion by a wrongful act or disposition
7  of property rights; and (3) damages.  Burlesci v. Petersen, 68
8  Cal.App.4th 1062, 1065 (1998).  Conversion is a strict liability
9  tort.  Id.

10    Superior Farming purchased the exclusive rights to the
11  Sugarone variety by virtue of the 1972 acquisition.  Peters'
12  unauthorized and undisclosed retention of the Sugarone vines
13  after the acquisition closed was unlawful, counter-defendants'
14  present possession of Sugarone vines is the direct result of
15  Peters' conversion, and Sun Pacific's sale of 672 boxes of
16  Sugarone grapes at approximately $12 a box damaged Sun World in
17  the amount of $8,064.  The court concludes that counter-
18  defendants are liable for conversion pursuant to claim one.

19          **G.   Intentional Misrepresentation.**

20    In the tort of "fraudulent deceit" set forth in California
21  Civil Code § 1709, the term "deceit" is defined to include "the
22  suppression of a fact, by one who is bound to disclose it, or who
23  gives information of other facts which are likely to mislead for
24  want of communication of that fact."  California Civil Code §
25  1710(3).  Under California Civil Code §§ 1567 and 1568, an
26  apparent consent to a contract is not real or free when obtained

27

1 by fraud and consent is deemed to have been obtained by fraud
2 "only when it would not have been given had such cause not
3 existed."   In the tort of "actual fraud" set forth in California
4 Civil Code § 1572, "actual fraud" is defined the "suppression of
5 that which is true, by one having knowledge or belief of the
6 fact" which is "committed by a party to the contract, or with his
7 connivance, with intent to deceive another party thereto ...."
8 California courts use the terms "fraud" and "deceit"
9 interchangeably.   Consequently, whether pursued as an independent
10 tort or as part of a claim arising out of a contractual
11 relationship, the elements of fraud are generally the same.   The
12 elements of fraud based on suppression of a fact or nondisclosure
13 of a fact are: (1) nondisclosure of material facts, (2) the
14 defendant's knowledge of these facts and of their being unknown
15 to or beyond the reach of the plaintiff, (3) the defendant's
16 intent to induce action by the plaintiff, (4), the plaintiff's
17 inducement by reason of the nondisclosure, and (5) resulting
18 damages.

19     During negotiations, Peters asked for permission to grow the
20 Sugarone variety after the acquisition was completed.   Superior
21 Farming rejected that request and stated that it would not enter
22 into the deal if that provision were included.   Peters
23 acknowledged this rejection and there were no further discussions
24 of this point.   Nevertheless, on the eve of the closing, Peters
25 secretly took Sugarone cuttings from the Mecca ranch.   At the
26 time Peters did this, Superior Farming had already completed its

1  inspection of the Mecca ranch and, in any event, a diligent
2  inspection would not have revealed the removal. Peters did not
3  disclose the removal even though he understood that Superior
4  Farming intended to purchase the entire business of raising and
5  marketing fruits and grapes and that Superior Farming had
6  rejected his request to grow the Sugarone variety after the
7  acquisition closed. Peters needed the Sugarone cuttings to
8  posses the Sugarone variety after the acquisition. Peters
9  concealed his actions for many years. Peters' failure to
10 disclose his actions was intended to induce reliance by Superior
11 Farming that it was acquiring all of the Sugarone vines and did
12 induce Superior Farming to complete the acquisition to the
13 detriment of Superior Farming. For these reasons, independent of
14 all other conclusions of law here, the court concludes that
15 Peters committed fraud by removing and retaining Sugarone plant
16 material and that Peters' and Sun Pacific's present possession of
17 Sugarone vines is wrongful.

18        **H.  Compensatory Damages.**

19       The court awards Sun World $8,064.00 as compensatory damages
20 resulting from the claims for conversion in Count One and
21 intentional misrepresentation in Count Three. These compensatory
22 damages are based on Sun Pacific's sale of 672 boxes of Sugarone
23 grapes at approximately $12 a box.

24        **I.  Punitive Damages.**

25       The Due Process Clause of the Fourteenth Amendment prohibits
26 the imposition of grossly excessive or arbitrary punishments on a

                                    29

1  tortfeasor.  <u>State Farm Mutual Automobile Insurance Co. v.</u>
2  <u>Campbell</u>, 538 U.S. 408, 416 (2003).  In assessing punitive
3  damages, the court must consider (1) the degree of
4  reprehensibility of the defendants' misconduct and (2) the
5  disparity between the actual or potential harm suffered by the
6  plaintiff and the punitive damages awarded, and (3) the
7  difference between the punitive damages awarded and the civil
8  penalties authorized or imposed in comparable cases.  <u>State Farm</u>
9  <u>Mutual Automobile Insurance Co. v. Campbell</u>, 538 U.S. 408, 418
10 (2003).  The most important of these considerations is the degree
11 of reprehensibility of the defendants' conduct.  <u>Id</u>. at 419.

12      With regard to the reprehensibility of the defendants'
13 conduct, the court concludes that the harm suffered by Sun World
14 resulted from fraud and deceit and was not caused by mere
15 accident.

16      With regard to the disparity between the actual or potential
17 harm, although the Supreme Court declined to impose a bright-line
18 ratio which a punitive damages award cannot exceed, <u>Campbell</u>,
19 <u>id.</u>, 538 U.S. at 425, the Supreme Court noted that "in practice,
20 few awards exceeding a single-digit ratio between punitive and
21 compensatory damages, to a significant degree, will satisfy due
22 process."  <u>Id</u>.  However, in determining a punitive damages award,
23 courts are permitted to consider the potential, as well as
24 actual, harm to the plaintiff and to increase the ratio where
25 particularly egregious conduct has resulted in only a small
26 amount of compensatory damages.  <u>Id</u>. at 425.

1       Using a single-diget ratio of 9 to 1, the amount of punitive
2 damages would be approximately $72,000.00.  However, considering
3 the potential harm to Sun World as well as the particularly
4 egregious nature of the misconduct, the court concludes that an
5 award of punitive damages in excess of that amount is
6 warranted.The parties to the acquisition engaged in lengthy and
7 detailed negotiations wherein Superior Farming paid $7.7 million
8 for, among other things, the exclusive rights to the patented
9 varieties, including the Sugarone variety.  By means of fraud and
10 conversion, Peters and Sun Pacific have attempted to deprive Sun
11 World of the property rights in the Sugarone variety that
12 Superior Farming purchased.  Peters asked during the negotiations
13 to grow the Sugarone variety after the acquisition closed, which
14 request was rejected by Superior Farming.  Nevertheless, on the
15 eve of the closing, Peters secretly removed Sugarone cuttings
16 from the Mecca ranch.  Peters did not tell Garabedian of his
17 actions nor did he tell Superior Farming prior to the closing.
18 Peters concealed this conduct for decades until this litigation
19 was commenced, after Sun Pacific agreed to indemnify Peters
20 against all litigation based on the possession, propagation or
21 sale of the Superior Seedless/Sugarone variety.  Peters' seizure
22 of the Sugarone cuttings on the eve of the closing and his
23 transfer of those vines with an indemnification agreement to Sun
24 World's competitor created a serious threat to Sun World's
25 exclusive control of the Sugarone variety.  Although Sun World
26 has suffered relatively minimal economic damages, Sun Pacific's

wrongful possession of the Sugarone variety and its capacity to commercially exploit that wrongful possession placed Sun World under the threat of immediate and potentially devastating damages in the absence of this judgment. Peters and Sun Pacific knew that the compensatory damages would be minimal while the risks and costs that Sun World would incur in defending its exclusive right to the Sugarone variety would be substantial and immediate. The Sugarone variety is a leading source of revenue and profit to Sun World, which is a $100 million per year corporation attempting to emerge from Chapter 11 bankruptcy. Peters' and Sun Pacific's actions raise a significant threat to the viability of Sun World. In addition, the court concludes that the compensatory damages do not make Sun World whole because, in initiating this litigation, Peters and Sun Pacific have forced Sun World to incur hundreds of thousands of dollars in attorneys' fees. Consequently, the court concludes that Peters' and Sun Pacific's egregious acts resulted in relatively minimal compensatory damages and that an award of $250,000.00 in punitive damages is necessary to achieve the goals of punishment and deterrence.

### J. Costs.

Sun World is awarded costs in the amount of $27,684.30 pursuant to 28 U.S.C. § 1920, Rule 54(d), Federal Rules of Civil Procedure, and Rule 54-292, Local Rules of Practice, the court concluding that the objections to the requested costs are without merit.

32

1    For the foregoing reasons, the following relief is granted
2  in favor of defendant/counter-claimant Sun World International,
3  Inc. and against plaintiff Sun Pacific Farming Cooperative, Inc
4  and counter-defendants Sun Pacific Farming Cooperative, Inc., Sun
5  Pacific Farming Co., Bernie H. Evans III and Richard Peters on
6  Sun World's first claim for relief for conversion, its third
7  claim for relief for intentional misrepresentation, and its ninth
8  claim for relief for declaratory judgment:

9        1.  Counter-defendants, and each of them, and their
10  agents, servants, and employees, and all persons acting under any
11  license or sub-license agreement with them or for them are
12  permanently enjoined from converting, propagating, growing,
13  selling, licensing, distributing, using in any plant breeding
14  program, farming activity or otherwise marketing or exporting
15  Sugarone grapevines, Sugarone vines, Sugarone cuttings and
16  Sugarone derivatives or progeny derived from those cuttings taken
17  by Richard Peters from the Mecca ranch in 1972 (Sugarone
18  Materials) and from holding themselves out as the lawful owner of
19  these Sugarone Materials and are ordered to return to Sun World
20  all Sugarone Materials and any records, charts, formulas, or
21  propagating material related to the Sugarone variety in counter-
22  defendant's possession or control derived from the Sugarone
23  Materials or, at Sun World's election, to destroy all such
24  Sugarone Materials under the supervision and observation of a
25  representative of Sun World, within 60 days of entry of judgment.
26        2.  Pay to Sun World $8,064.00 in compensatory damages.

33

1         3.   Pay to Sun World $250,000.00 in punitive damages.

2         4.   Pay to Sun World $27,684.03 in costs.

3         5.   The court declares that Sun World has legal title

4 to all Sugarone Materials in counter-defendants' possession,

5 custody, or control as of the date of entry of judgment.

6         6.   The court declares that counter-defendants have no

7 lawful right to possess, control, propagate, market, develop, or

8 transfer Sugarone Materials, that Sun World holds all right,

9 title and interest in the Sugarone Materials, that counter-

10 defendants have no lawful right to hold themselves out as lawful

11 owners or sellers of the Sugarone Materials, that counter-

12 defendants shall provide to Sun World a complete accounting of

13 all Sugarone Materials in the possession, custody or control of

14 counter-defendants or any of them within 60 days of entry of

15 judgment.

16     Judgment shall be entered by a separate document pursuant to

17 Rule 58, Federal Rules of Civil Procedure.

18     Dated: $\underline{June\ 16}$ , 2006

19

20                                     ROBERT E. COYLE
                                    UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

34